Botsford, J.
The plaintiffs, five residents of the City of Cambridge, bring this action under G.L.c. 40A, §17, to challenge the granting of a special permit by the Board of Zoning Appeal of the City of Cambridge (board). The matter was tried before me without a jury on November 17, 1999. Set forth below are my findings of fact and a discussion of the legal issues raised. For the reasons summarized there, I conclude that the plaintiffs’ challenge fails, and accordingly, that judgment in this case should enter affirming the board’s decision.

*517
Findings of Fact

The property in question is located at 420 Broadway in Cambridge (the locus). The locus consists of a 5000 square foot lot on the corner of Broadway and Ellery Street and has on it a single story commercial building which occupies approximately 3,400 square feet. It is located in a Residence C-l District as defined by the Cambridge Zoning Ordinance (the Ordinance). For more than forty years, the locus has been operated for the retail sale of merchandise, which is not a permitted use as of right in a Residence C-l District. Most recently, from 1978 until approximately June 1, 1999, a retail grocery store known as Sage’s Market has occupied most of the building on the locus, with a self-service laundromat operating in the remaining portion. Sage’s Market has operated pursuant to a variance for use and parking granted by the board in May 1978.
The locus is outside of an Institutional Overlay District, as defined in Section 4.54 of the Ordinance. It has an existing lot status of (2), that is, “[a] lot which contains any use other than those residential and institutional uses listed in Subsection 4.31 or 4.33 [of the Ordinance] ...”
Sage’s Market closed its doors on or about June 1, 1999. The government of Switzerland (Swiss government) has contracted to purchase the locus from its present owner, Charles E. Sage, trustee of the S&M Realty Trust. The Swiss government intends to establish on the locus a consular office and program that would be known as the Swiss House for Advanced Research and Education (SHARE or Swiss House). SHARE is a new program designed to increase cooperation and networking between and among Swiss scientists,[3] Swiss business people and American scientists in the Boston area on scientific and technological projects and issues. Swiss House, the name to be given to the SHARE facility, would provide a meeting place, study and non-experimental research center for scientists and academics. It would also provide extensive computer capability, have a capacity for teleconferencing, and would contain a library with special books about Switzerland and science in Switzerland. However, Swiss House would not offer regular consular services such as passports and visas or be open to the general public for any regular purpose. The Swiss government proposes to open the facility two times a year for community use, either as meeting space or as an arts exhibition space. Some discussions have also taken place with the principal of Rindge and Latin school concerning the possibility of joint activities involving Swiss House and the students.
The SHARE program would have a staff of three, one full-time director and two others working on a half-time basis as support staff. While scientists and academics would use the facility, it is not expected that the numbers of persons at any one time would be very great. Meetings of four to ten individuals might occur two or three times a week, but there is no plan to use the facility for large conferences or lectures. Moreover, it is contemplated that the staff as well as those meeting at or otherwise using the SHARE facility would generally use public transportation, taxis or walk,[4] so that the amount of vehicular traffic and need for parking spaces would be relatively small.[5]
Under Article 4.56 of the Ordinance, entitled “Table of Institutional Use Regulations,” the proposed use of the locus by the Swiss government fits within Section 4.56(d)(2), “(p)rivate library, study center or other research facility.”
The building currently on the locus is a one story, rectangular structure with a flat roof, consisting of two stores with glass store fronts. The Swiss government intends to return the building to its original brick facade, to replace the store fronts with windows and add windows on the sides and rear of the building, and to increase the external lighting, but no additional construction is contemplated such as, e.g., the addition of one or more stories or enlargement of the building footprint. The interior of the building would be completely renovated and ultimately Swiss House would consist of a ground floor of 3200 square feet with a central open meeting area, a cafe and kitchenette, and a media room. There would be 800 square feet of office space at a gallery level above the ground floor.
Sage’s Market, the convenience store operating at the locus through May of 1999, was open seven days per week, apparently from 7:30 a.m. to 9:30 p.m. Quite a significant amount of trash and litter collected around the building, although not necessarily attributable in whole or significant part to the store. On the flat roof of the building there were large heating and air conditioning units that were noisy. It is contemplated that the Swiss House would be open on weekdays during regular business hours, approximately 8:00 a.m. to 6:00 p.m., and closed on weekends. The building might be open for evening activities once or twice a week. Swiss House will use heat and air conditioning, but it does not appear from diagrams that Swiss House will retain the large units on the roof of the building.
The locus is between Harvard Square and Central Square, about a ten-minute walk from Harvard Square and its subway stop, and approximately the same distance from Central Square and the subway stop there. Diagonally across the street from the locus is a park that is devoted to passive recreation. On the other side of that park is the Cambridge Rindge and Latin School and the Cambridge Public Library. This area is generally residential in character.
Broadway Market, described by all witnesses as an upscale but very good food market, is located approximately two and one-half blocks down Broadway from the locus, in the direction of Harvard Square.
*518 The plaintiffs live in fairly close proximity to the locus, but most are not abutters. The plaintiff Stavos Mackrakis lives at 61 Ellery Street, in a house on the other side of Ellery Street from the locus and two or three buildings down towards Harvard Square. Mackrakis can see the side, rear and roof of the building on the locus from his house. When Sage’s Market was open, Mackrakis bought food items there approximately two times per week. Broadway Market is within several hundred yards of his house. Mackrakis has off-street parking for himself and his family, but he has no off-street parking available for his tenants. His current tenants do not have any cars.
The plaintiff William Schreiber lives at 8 Ellery Square in a town house that is part of a condominium development. The common courtyard of the Ellery Square development extends to the locus, so that Schreiber effectively abuts the locus. He can see the locus from his house. Schreiber bought food at Sage’s about two times per week, but has also used the Broadway Market.
The plaintiff Joan Pickett Uves in a two family house to the rear of Mackrakis’ house on Ellery Street. It appears Pickett’s house is landlocked, with no direct access to any street. There is no parking associated with Pickett’s house, and therefore she relies on on-street parking. The same is true generally of her four tenants. The plaintiff Charles Girdosky lives at 423 Broadway, on the other side of the street from the locus, slightly down from the building directly opposite the locus. Girdosky looks almost directly on the locus from his front widows. Girdosky and his family used Sage’s Market very frequently, perhaps 250 times per year. Girdosky has off-street parking for his house, and only uses on-street parking on a temporary basis, for example when he is delivering something to his house or in bad weather to pick up or drop off his family. Finally, the plaintiff David Szlag lives at 74 Ellery Street. His home is on the other side of Broadway from the locus, and one building down from the corner building directly opposite the locus.
All the plaintiffs share a concern about the loss of a close neighborhood food and convenience store which has recently resulted from the closing of Sage’s Market and which will be made permanent if Swiss House opens on the locus. Most of the plaintiffs are also concerned that Swiss House, through its staff and visitors, will exacerbate an already tight parking situation in the neighborhood by using some of the limited number of available on-street spaces.
The Swiss government applied to the board for a special permit for the locus in May 1999. The special permit was sought for two reasons: (1) because of the proposed change in use from a small retail operation to a study and meeting center, and (2) to seek relief from the provisions of the zoning ordinance related to off-street parking spaces. The board held a public hearing on July 15, 1999.[6] A number of the plaintiffs testified against the special permit application, and there were other neighbors who testified in its favor. On August 26, 1999, the board issued a decision granting the requested special permit, subject to conditions.
In its decision, the board determined under §4.57 of the Ordinance that the benefits of the proposed use of the locus would outweigh its detriments. It considered and voted separately on each of the nine benefits and of the five detriments that are described in §4.57. In particular, with respect to benefits of the proposed use of the locus, the board decided: that Swiss House and the SHARE program would be particularly appropriate on the lot given the previous use of the lot (§4.57 Benefits, 5); and would be particularly appropriate given institutional uses of adjacent or nearby lots (§4.57 Benefits, 6); that residential development would not be feasible or reasonably practical on the site (§4.57 Benefits, 7); and that the proposed institutional use of the site would create a stronger buffer or a more gentle transition between residential and non-residential areas (§4.57 Benefits, 8), and would result in a net improvement to the neighborhood by being more compatible than the previous use of the lot (§4.57 Benefits, 9). On the detriment side of the equation, the board found that: the intensity of the proposed institutional use would be substantially greater them the use intensity of residences in the neighborhood §4.57 Detriments, 2); and the proposed use would eliminate non-residential services which are beneficial to the neighborhood (§4.57 Detriments, 5). The board also found that the change in use for the locus would not be substantially more detrimental to the neighborhood than the existing nonconforming use. The conditions which the board imposed included the following: the renovation of the premises must take place in accordance with plans on file, as those plans may be revised to comply with requirements of the Cambridge Historical Commission and the Mid-Cambridge Neighborhood Conservation District Commission; the hours of operation for the Swiss House would be 8:00 a.m. to 6:00 p.m., with evening use not to exceed two evenings in one week, and weekend use no greater than one weekend per month; no consular activities may be conducted at the locus which would involve members of the public seeking services; there may be no more than three individual offices in the building; and there maybe no more than three regular employees. Finally, with respect to parking, the board granted the special permit request to reduce the number of required parking spaces from eleven to two, based on specific findings that the reduced amount of parking would not cause excessive congestion, endanger public safety, or substantially reduce parking available for other uses, otherwise adversely affect the neighborhood, or that such lesser amount of parking will provide positive environmental or other benefits to users of the lot and the neighborhood.
*519 The plaintiffs timely filed their complaint in this action, challenging the validity of the special permit.

DISCUSSION

1. The Plaintiffs’ Standing
The defendants challenge the standing of all the plaintiffs to bring this zoning appeal. Under G.L.c. 40A, §17, “[a]ny person aggrieved” by the board’s decision may appeal; the question, therefore, is whether one or more of the plaintiffs qualify as person! s] aggrieved." Any plaintiff who is an abutter to the locus, or an abutter to an abutter within 300 feet of the property line of the locus, or who owns property directly opposite the locus on Broadway or Ellery Street — that is, any plaintiff who qualifies as a “partly] in interest” as defined in G.L.c. 40A, §11 — presumptively is an aggrieved person with standing to challenge the board’s decision. See Watros v. Greater Lynn Mental Health & Retardation Assn, Inc., 421 Mass. 106, 110-11 (1995). However, the presumption disappears when a defendant challenges the person’s status as an aggrieved person, and offers evidence that would justify a finding of no aggrievement. Id., at 111. Accord, Marashlian v. Zoning Bd. of Appeals of Newburyport, 421 Mass. 719, 721 (1995); Barvenik v. Aldermen of Newton, 33 Mass.App.Ct. 123, 131 (1992).
One of the plaintiffs in this case enjoys the presumption of standing, William Schreiber, who qualifies as an abutter to the locus.[7] For the defendants to challenge the standing of at least Schreiber, therefore, it was incumbent on them to offer evidence supporting the challenge. To determine whether the defendants succeeded in this task, it is necessary to consider what injuries Schreiber and the other plaintiffs claim to suffer on account of the proposed use of the locus for the SHARE program. There are two: loss of a very convenient neighborhood food market, and a reduction in available on-street parking. The loss of the market — which clearly was the principal loss asserted by all the plaintiffs at trial — does not represent “ ‘a plausible claim of a definite violation of a private right, a private property interest, or a private legal interest’ necessary to challenge the permit at issue.” Bell v. Zoning Bd of Appeals of Gloucester, 429 Mass. 551, 554 (1999), quoting Harvard Square Defense Fund, Inc. v. Planning Bd of Cambridge, 27 Mass.App.Ct. 491, 493 (1989). Individuals residing in a neighborhood have no entitlement to a neighborhood grocery store, particularly where, as here, the grocery store that did exist was only permitted by virtue of a variance.
The second loss, parking, is an interest for which Schreiber and the other plaintiffs are entitled to seek protection under the zoning laws. See, e.g., Marashlian, supra, 421 Mass. at 722. It is thus necessary to look at all the evidence to resolve the standing question. The direct evidence concerning parking was provided by Dr. Xavier Comptesse, who would serve as director of the SHARE program. As set out in the findings above (see n. 4), according to Comptesse, the Swiss government does not anticipate any need for off-street parking associated with the SHARE program because those using the Swiss House facility will use their feet, public transportation, or taxis. I have credited this testimony, but obviously it has a speculative aspect to it, because it deals with predictions. It is only reasonable to infer from the description of the SHARE program and its likely participants that from time to time there will be individuals — American scientists and professors, for example — who will drive to the facility and need access to parking. In the circumstances, there maybe a slight decrease in the available on-street parking at least during the regular hours of the Swiss House’s operation, but it is very hard to predict on the basis of the record presented.[8] If there were even a minimal decrease in parking availability, it is probably sufficient to provide Schreiber and other the plaintiffs (or some of them) with standing. See id. In light of the closeness of the question, it makes sense to consider the merits of the plaintiffs’ claims.
2. Variance or Special Permit
The plaintiffs argue that the board’s decision must be anulled because the Swiss government was obligated to apply for a variance for its SHARE project, and could not proceed by way of special permit application. I disagree.
The plaintiffs’ claim is based on Article 8.00, §§8.22.2(c) and 8.22.3 of the Ordinance. These sections provide that an alteration or enlargement of a nonconforming structure may be by special permit, but any change in a nonconforming use must be by variance. The plaintiffs are correct that the SHARE project represents a change in use rather than a change in structure. The flaw in their argument is that under the Ordinance, a nonconforming structure or use is defined as a structure or use that pre-existed the Ordinance, see, e.g., §§8.11, 8.21, 8.22.2, and Sage’s Market did not qualify as either. Rather, the presence of Sage’s Market in a residential zone was permitted specifically by variance. Sections 8.22.2(c) and 8.22.3 do not, therefore, apply. See Mendes v. Board of Appeals of Barnstable, 28 Mass.App.Ct. 527, 528-30 (1990). The pertinent section of the Ordinance is §4.50, which governs “the use of land for institutional purposes in residentially zoned districts . . .” id.[9] The parties have stipulated that the locus is located outside an Institutional Overlay District pursuant to §4.54 of the Ordinance, that the locus is defined as having an “existing lot status” of (2) under §4.55.1 of the Ordinance, and the proposed use is defined as “private library, study center, or other research facility” in the Table of Institutional Use Regulations, §4.56(d)(2) of the Ordinance. Given these facts, the proposed use may be permitted upon a successful application for a special permit, see §4.56(d)(2) and a variance is not required.
*520 3. Special Permit
“Under the relatively flexible standard applicable to the allowance of a special permit, the power of a local board to grant a special permit is a discretionary one and such a decision can be reversed only if arbitrary, capricious, whimsical or based on a legally untenable ground.” Mendes v. Board of Appeals of Barnstable, supra, 28 Mass.App.Ct. at 531 n. 9, and cases cited. See Kiss v. Board of Appeals of Longmeadow, 371 Mass. 147, 153-54 (1976). None of these terms accurately describes the board’s decision in this case.
As indicated above, the board expressly reviewed whether the proposed use of the locus satisfied the applicable criteria spelled out in §4.57 of the Ordinance, which deals with special permits for proposed institutional uses of property in designated locations. Section 4.57 provides that the board “shall grant a special permit for a use in Subsection 4.56 [describing institutional use categories by location and the type of regulation that applies] only if it determines that the benefits of the proposed use at that location will outweigh its detriments ...” Section 4.57 then lists nine separate benefits[10] and five separate detriments. [11] The board found that five of the nine benefits applied.
The evidence introduced at trial supports the board’s determinations. Thus, in light of the prior use of the locus as the site for a food market rather than any residential use, it is reasonable to conclude that “institutional use would be particularly appropriate on the lot given previous use of the lot.” (§4.57, Benefits, 5.) With a high school and municipal library as the two most significant institutional uses reasonably nearby to the locus, the conclusion is also reasonable that the proposed Swiss House, which would be a study center with books about Switzerland and related resources (e.g.. computers) and would be periodically open to the neighborhood public, represents a particularly appropriate institutional use for this neighborhood. (Id., Benefits, 6.) As for the next benefit, that “residential development would not be feasible or reasonably practical on the site," (Id., Benefits, 7.), the plaintiffs at trial did not appear to contest the truth of this proposition in relation to the locus. And in light of the location of the proposed Swiss House between the non-residential areas of Harvard and Central Squares, with their intense commercial and institutional uses, it is reasonable to view a noncommercial study, meeting center and library facility as offering “a more gentle transition between residential and non residential areas” than a convenience store and food market. (Id., Benefits, 8.) Finally, with respect to the last benefit listed in §4.57, that the proposed use would be “more compatible than the previous use of the lot” and therefore “result in a net improvement to the neighborhood” (id., Benefits, 9), again it is reasonable to conclude that a facility like the proposed Swiss House, to be used by academics and visiting Swiss business persons for periodic meeting and study, is more compatible with the character of a residential area than a convenience store and market.[12]
In relation to detriments, the primary focus of the plaintiffs’ challenge is to what they view as the board’s conclusion in effect that Swiss House does not contravene the Cambridge Institutional Growth Management Plan (the Plan). The challenge fails.
Under §4.57, the question is not whether the proposed institutional use receives a negative score on the “use evaluation matrix” included in the Plan. Rather, the issue is whether the proposed use “would substantially contravene the objectives of the. .. Plan.” (§4.57, Detriments, 1.) The Plan itself consists of a series of planning documents prepared by the Cambridge Community Development Department in 1980 and 1981, as an impetus to adoption of changes in the city’s zoning ordinance to regulate institutional uses.[13] It is difficult to isolate from the plan a discrete set of objectives, but generally, they appear to be to restrict institutional expansion in residential areas — recognizing that some institutional growth is to be expected and is necessary — and to regulate the development of institutional growth in a manner which reflects that residential aireas with a more intense development of institutional uses may be better able to accommodate new institutions than residential areas which have few existing institutional uses. (See Proposed Strategy for Managing Institutional Expansion (October 1980), pp. 2, 3.)
The proposed Swiss House does not substantially contradict these objectives. The proposed facility is replacing a commercial use, not a residential one, and thus is not expanding the non-residential character of the neighborhood. Moreover, the proposed facility would be structurally more compatible with a residential neighborhood, with its brick facade and the addition of regularly spaced windows at the ground floor level instead of a commercial store front and windowless rear and side walls. Nor will Swiss House generate substantial traffic or materially decrease available parking. While the area immediately surrounding the locus may not have many institutional uses, the high school and public library are not far away, and, as discussed above, Swiss House as proposed appears compatible with these uses.[14]
The other detriment which the board found not to apply and which the plaintiffs contest is that activity patterns connected with the proposed use, including pedestrian and vehicle travel, would not differ from existing neighborhood activity so as to affect adversely the neighborhood. (§4.57, Detriments, 3.) On this factor, again, the evidence indicates that an increase in vehicular traffic and parking needs associated with the Swiss House, if any, would probably be fairly minimal; certainly the whole activity pattern of the proposed use would not be more intense than the “existing neighborhood pattern,” if one considers the *521 operations of Sage’s Market as part of that existing pattern.
In sum, the Board’s ultimate conclusion under §4.57 that the benefits arising from the proposed use of the locus would outweigh its detriments was not arbitrary, capricious, whimsical or legally untenable.[15]
The remaining matter raised by the Swiss government’s special permit request concerns parking. In its decision, the board found that a reduction in parking from the eleven spaces required by §6.36 of the Ordinance for the proposed facility (one space for every 300 square feet) to the two requested would be appropriate, based on the specific findings it made pursuant to §6.35. (See p. 9 above, where these findings are described.) The evidence presented at trial supports the board’s findings. The proposed Swiss House will be open generally during the business day only, will have a small staff with little to no parking needs, and will have visitors who are expected primarily to use taxis and public transportation. The plaintiffs did not present any contrary evidence at trial, or any information that might flesh out their conclusory statements that congestion and a substantial reduction of available parking would occur.
The plaintiffs also challenge the validfly of the granting of a special permit in this case because in their view the Swiss government’s application did not comply with §4.58.1 of the Ordinance, and therefore, under §4.58.2, the board was not authorized to accept the application. It does appear that the special permit application failed to include “[a] statement of how the anticipated physical attributes of the use will be similar to or different from those predicted for that category of use generally in the Cambridge Institutional Growth Management Plan." §4.58.1(6). However, I agree with the defendants that in this case the failure is not of such substantive significance that it should invalidate the special permit application and the board’s decision granting the special permit. See Zartarian v. Minkin, 357 Mass. 14, 17-18 (1970). The application and associated submissions describe in detail the proposed physical structure of Swiss House and its site plan, as well as the nature of the proposed use for the SHARE program. These materials, supported by the information provided at the board’s hearing on behalf of the applicant, gave the board an ample basis on which to compare the proposed use to the Plan. At this stage, one would be exalting form over substance to invalidate the board’s decision because of the contents of the special permit application.

ORDER

For the foregoing reasons, the decision of the Board of Zoning Appeal of the City of Cambridge granting a special permit to the Government of Switzerland is affirmed, and a final judgment is to enter accordingly.

The Swiss scientists include those working and studying in the Boston area, currently about 600, and those in Switzerland.

There was credible testimony from Dr. Xavier Comptesse, a representative of the Swiss government who would be the director of the SHARE program, that the Swiss scientists participating in the SHARE program would be either studying in this country on government stipends, and without cars, or visiting from Switzerland and likely to travel by taxi; that the American scientists would be from local universities and would be likely to walk or take public transportation to the Swiss House, that he himself lived within short walking distance of the locus, and that the other two part-time staff would not be driving.

While there certainly was no direct evidence of potential parking shortages, increased traffic or congestion arising in connection with the proposed use of the locus for the SHARE program, I infer that some minimal increase in traffic and in the need for street parking may occur in comparison to a purely residential use, depending on the size of residential structure that is compared.

By the time of the public hearing before the board, the Swiss government had obtained the approval of the Mid-Cambridge Neighborhood Conservation District Commission for its proposed SHARE facility, subject to review of an architects’ committee of certain plans.

None of the other plaintiffs is an abutter or fits within any of the alternative statutory categories of “parties in interest."

Swiss House would have two off-street parking spaces that possibly could be used by visitors to the facility since the three staff members are not intending to drive to work. However, there was no evidence introduced on how the two parking spaces actually would be used. There was also no evidence on how, if at all, the operation of Sage's Market affected the availability of on-street parking in this area, but that question is not of any direct relevance since the market itself was a nonconforming use in a residential zone.

Section 4.50 is entitled “Institutional Use Regulations." It contains subsections 4.51 through 4.58, and some sub-subsections (e.g. 4.54.1-4.54.8). For reference purposes in this memorandum, no distinction is drawn between sections, subsections and subsubsections; each is referred to as “§_.”

The benefits are; (1) "the building design or site plan would be compatible with the neighborhood"; (2) “the institution would be accessible to or primarily oriented toward neighborhood residents"; (3) “the institution would fulfill an identified neighborhood need”; (4) “[t]he institution would fulfill an identified city wide need"; (5) “[¡Institutional use would be particularly appropriate on the lot given previous use of the lot"; (6) “[ijnstitutional use would be particularly appropriate on the lot given institutional use of adjacent or nearby lots"; (7) “[rlesidential development would not be feasible or reasonably practical on the site"; “(8) ”[t]he proposed institutional use would create a stronger buffer or a more gentle transition between residential and nonresidential areas"; (9) “[t]he proposed institutional use would result in a net improvement to the neighborhood by being more compatible than the previous use of the lot.” Section 4.57, Benefits.

The detriments are; (1) “[development of the institutional use would substantially contravene the objectives of the Cambridge Institutional Use Management Plan"; (2) “[t]he intensity of the institutional use would be substantially greater than the use intensity of residences in the neighborhood, including traffic, building bulk, parking demands, etc."; (3)"[t]he activity patterns, including pedestrian and vehicle *522 travel to and from the institution would differ from existing neighborhood activity patterns so as to adversely impact the neighborhood"; (4) “[djevelopment of an institutional use would eliminate existing dwelling units"; and (5) “[dievelopment of an institutional use would eliminate nonresidential services or activities which are beneficial to the neighborhood." Section 4.57, Detriments.

The plaintiffs share a desire to have a food store located in very close proximity to their homes, and thus they contend that any use of the locus for a purpose other than a food market does not result in a net improvement to the neighborhood. But the plaintiffs' preference for a food market, while intense, is not universally accepted, and in fight of the proposed appearance and use of Swiss House, the Board’s judgment that this facility would represent a net improvement to the neighborhood cannot be deemed arbitrary.

Section 4.50 of the Ordinance represents the changes that were adopted in response.

The plaintiffs contend that on the “use evaluation matrix" in the Plan, the proposed Swiss House facility attains a score of -21, and thus should not be permitted at all. Accordingly, they state, the board’s approval of the proposed use is legally untenable and should be reversed. I disagree. As the Plan states, the “matrix evaluation system” primarily constitutes a qualitative assessment of the nature of an attribute pertaining to an institutional use, not a scientific evaluation. Furthermore, the relative importance of the attributes has not been weighed. Moreover, the scoring for the proposed Swiss House suggested by the plaintiffs is incorrect. The plaintiffs are characterizing the Swiss House as a “science oriented non-commercial research" facility. In fact, as the parties' stipulation states, the facility is a “private library, study center or other non-commercial research facility," a use which has a score of -12. However, because the use matrix is a guideline and based on subjective, qualitative judgments, the actual score listed in the matrix is not itself dispositive. Based on the evidence in this case, for example, I conclude that the stated negative scores in the matrix for intensity of use are too high, and the overall score should be quite a bit lower than -12.

Under §4.57, the board must consider benefits and detriments, but must also make any determinations required by certain footnotes to the “Table of Institutional Use Regulations” in §4.56, or by §10.43 of the Ordinance. In this case, none of the footnotes to the table apply. As for §10.43, it provides;
Special permits will normally be granted where specific provisions of this Ordinance are met, except when particulars of the location or use, not generally true of the district or of the uses permitted in it, would cause granting of such permit to be to the detriment of the public interest because
(a) It appears that requirements of this Ordinance cannot or will not be met, or
(b) traffic generated or patterns of access or egress would cause congestion, hazard, or substantial change in established neighborhood character, or
(c) the continued operation of or the development of adjacent uses as permitted in the Zoning Ordinance would be adversely affected by the nature of the proposed use or
(d) nuisance or hazard would be created ... , or
(e) for other reasons, the proposed use would impair the integrity of the district or adjoining district, or otherwise derogate from the intent and purpose of this Ordinance.
§10.43. In its decision the board specifically addressed each of these five criteria, finding that none of them applied to the proposed use at issue. The board's findings were not arbitrary or capricious.